Myles A. Schneider, #028436
**Myles A. Schneider & Associates, LTD**
14001 N. 7th Street
Suite B104
Phoenix, AZ 85022
Telephone (602) 926-7373
Facsimile (877) 294-4254
Email myles@maschneider.com
**Attorney for Defendant**
**James TA McCarty**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | Case Nos.: |
|---|---|
| Plaintiff, | 3:22-cr-8133-SPL |
| v. | 2:24-cr-00122-SPL |
| James TA McCarty, | **DEFENDANTS SENTENCING MEMORANDUM** |
| Defendant. | |

COMES NOW the Defendant, James TA McCarty, by and through undersigned Counsel, and provides this memorandum and requests this Court consider the arguments contained herein during sentencing.

RESPECTFULLY SUBMITTED this 10th day of June, 2024.

    Law Offices of
    MYLES ALBERT SCHNEIDER

    /s/*Myles Alber Schneider*
    MYLES ALBERT SCHNEIDER
    Attorney for Defendant

**INDEX OF EXHIBITS[1]**

Exhibit A – Report from Federal Mitigation Specialist, Amy Callahan;

Exhibit B – MITIGATION SCREENING REPORT, Gavin R. Baker, Psy.D;

Exhibit C – Letter from Nelli McCarty, Defendant's Aunt;

Exhibit D – Letter from Angela Curtright, Defendant's Family Friend;

Exhibit E – Letter from Cyndi Charley, in-law;

---

[1] Following under separate cover.

1

# INTRODUCTION

**Defendant's history and characteristics:**

1. At the age of Age 5, Defendant was evaluated and began receiving services for a speech and language delay at Kayenta Unified School District. His speech was 25-50% intelligible and his articulation was judged to be significantly delayed and in need of remediation. James received speech and language therapy until 2010. (See Report from Federal Mitigation Specialist, Amy Callahan, attached hereto and incorporated herein by reference as exhibit A.) Defendant began playing video games at age 2. This supplemented his ability to speak. *By age 5, he was playing "Call of Duty" with teammates and was ranked 14th in the world.* (Id.) (Emphasis added.)

2. At the age of 7, Defendant was experiencing behavioral difficulties in school and at home. At this time, Defendant's mother was attempting to enter his life. Defendant was subsequently diagnosed with attention deficit disorder with hyperactivity. Defendant was prescribed stimulants which he would take over the next 11 years. (Id.)

3. At the age of 10, Kayenta Indian Health Services records indicated Defendant had difficulty paying attention and staying on task in school. Defendant began pulling and twisting his hair out ultimately causing bald spots. He was diagnosed with traction alopecia and trichotillomania. (Id.)

4. At the age of 13, Defendant was seen for a medication evaluation. His aunt had reported that he was bored with school and failing his classes. He spent an excessive time on YouTube and does not play any sports. James's stimulant medication was increased.

5. At the age of 15, Defendant's aunt/caretaker, Nellie McCarty, sought help due to Defendant to increase behaviors. Aunt Nellie noted that she had been his primary caretaker since he

was 4. His father was not a strong figure in his life. Defendant was constantly bullied at school for being white in an Indian based environment. Defendant was diagnosed with ADHD and Mood Swings. He was prescribed Fluoxetine aka Prozac to "help with the ups and downs. (Id.) It was also noted that Defendant suffered from a video game problem. He was using grandmother's credit cards for "in-game cash and chances to win." His aunt believes he has an obsession for video games and winning. Defendant was referred to an addiction specialist. (Id.)

6. Defendant has a predisposition to mental health disorders and generational trauma. His mother has a long history of mental health issues and has been diagnosed with bipolar disorder. She also suffers from trauma-related symptoms from repeatedly sexually abused by her biological father and grief issues due to losing a young child. Defendant's sister, Aurora (18), has also been diagnosed with bipolar disorder. She previously attempted suicide and has hospitalized on at least two occasions for ongoing mental health issues. Following Aurora's suicide attempt, Defendant began self-harming. He repeatedly cut himself on his wrist and has several scars as a result. (Id.)

7. At the Age of 16, Defendant's half-brother, Garet Ordain Denny, died suddenly due to suicide or an accidental overdose. After moving to North Carolina in 2021, Defendant attempted suicide; however, he did not seek medical treatment. Since his arrest, Defendant reports depressive symptoms. He is not currently prescribed any psychotropic medications. (Id.)

3

**Defendant's Mental Health:**

From 2005 to 2021, six U.S. Supreme Court opinions were issued regarding the prosecution and sentencing of juvenile offenders charged as adults (*Roper v. Simmons*, 2005; *Graham v. Florida and Sullivan v. Florida*, 2010; *Miller v. Alabama and Jackson v. Hobbs*, 2012; *Montgomery v. Louisiana*, 2016; Jones v. Mississippi, 2021). (See MITIGATION SCREENING REPORT, **Gavin R. Baker, Psy.D**, at page 3 (December 12, 2023) attached hereto as Exhibit B.)

8. In response to these U.S. Supreme Court decisions, the American Psychological Association (APA), the American Psychiatric Association, and the National Association of Social Workers issued a series of Amicus Briefs regarding standards derived from the above listed opinions and the current scientific consensus on brain development. In one of the most recent Amicus Briefs regarding Miller and Jackson (2012), the APA opined that juvenile offenders have diminished criminal culpability due to three brain-development-related attributes:

   a. **Immaturity**—That juveniles have an underdeveloped sense of responsibility which can result in ill-considered actions and decisions;

   b. **Vulnerability**—That juveniles are more susceptible to negative influences and peer pressure;

   c. **Changeability**—That the character of juveniles is not as well-formed as that of an adult, thereby giving juveniles greater potential for rehabilitation. (Id.)

9. Put concisely, the above listed developmental factors (immaturity, vulnerability, and changeability) should be considered as diminishing culpability for all individuals 20 years of age and younger at the time of their offense. (Id.)

10. Developmental immaturity is the direct result of underdevelopment of the frontal lobes (particularly the prefrontal cortices), which continue to grow and develop until around age

4

25. These areas of the brain are directly involved in decision-making, judgment, and impulse control, which is why such individuals are recognized to be both developmentally immature and vulnerable to making impulsive and poorly formulated decisions. (Id.)

11. Mr. McCarty's diagnosis of ADHD suggests that his decision-making capacity was likely further disrupted, in that ADHD impacts an individual's ability to focus and attend to their environment and manage impulsivity. Such a diagnosis would increase Mr. McCarty already underdeveloped decision-making capacity and make him prone to poorly formulated reasoning. He was also noted to experience depression. Severe depression can affect the brain and compromise an individual's sense of reality, further exacerbating developmental immaturity. (Id.)

12. Exhibiting self-harming behaviors (e.g., hair pulling) suggest the presence of trauma-related symptomatology, intense anxiety, and psychological distress. Despite the presence of these symptoms, he does not appear to have been diagnosed or treated for trauma and stressor-related disorder throughout his life. Following his arrest, he reported experiencing suicidality which is strongly associated with both depression and trauma-related disorders. Neither symptom of which appear to have been treated at any time throughout his life. (Id.)

13. The underdeveloped brain is particularly vulnerable to the dopaminergic feedback provided by video gaming (Weinstein et al., 2020). Research (Weinstein et al., 2020) examining the neurobiological *mechanisms of internet gaming disorder (IGD)* through objective brain studies concluded that IGT leads to the following neurobiological brain alterations:

5

a. Activation in brain regions associated with reward, as evident from cue exposure and craving studies and neurotransmitter systems studies that indicate an involvement of dopamine-mediated reward mechanisms;

b. Reduced activity in impulse control areas and impaired decision making;

c. Reduced functional connectivity in brain networks that are involved in cognitive control, executive function, motivation, and reward. (Id.)

14. The authors also noted the following: there are structural changes [in the brain], mainly reduction in gray-matter volume and whitematter density. Comorbidity studies indicate that executive control networks in attention deficit-hyperactivity disorder (ADHD) may increase the susceptibility to develop IGD. (Id.)

15. Given the data reviewed, Defendant was at substantial risk of developing an addiction to internet gaming, but also was vulnerable to the peer influence of others (**developmental vulnerability**) and committing ill-considered actions and decisions (**developmental immaturity**). Prolonged prison time is associated with poorer long-term mental health outcomes. Given indications of a prior diagnosis of ADHD, noted symptoms of depression, suicidality, self-harm, and substantial exposure to ACEs, and Mr. McCarty's age (**developmental changeability**), the Court may consider reducing his time spent incarcerated. (Id.)

**MITIGATION 18 U.S.C. § 3553**

The United States Supreme Court "… has long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the

possession of the fullest information possible concerning the defendant's life and characteristics.'" *Williams v. New York,* 337 U.S. 241, 246–247, 69 S.Ct. 1079 (1949).

"Congress codified this principle at 18 U.S.C. § 3661, which provides that '[n]o limitation shall be placed on the information' a sentencing court may consider 'concerning the [defendant's] background, character, and conduct,' and at § 3553(a), which sets forth certain factors that sentencing courts must consider, including 'the history and characteristics of the defendant,' § 3553(a)(1). *Pepper v. United States*, 562 U.S. 476, 476–80, 131 S. Ct. 1229, 1235 (2011).

Courts need not find any extraordinary circumstance to sentence a defendant outside the guidelines range, once courts correctly calculate the guidelines and make an individualized determination of a sentence that meets sentencing objectives. *United States v. Booker*, 543 U.S. 200, 125 S. Ct. 728 (2005); 18 U.S.C. § 3553. *Gall v. United States*, 522 U.S. 38, 47, 128 S. Ct. 586, 595 (2007).

In determining the sentence, the sentencing court should: (1) calculate the correct guidelines range; (2) determine whether to depart by considering Chapter Five, parts H and K, and any other policy statement or commentary in the Guidelines Manual; and (3) determine whether to impose a "variance" sentence by considering the factors set forth in 18 U.S.C. § 3553(a). U.S.S.G. §1B1.1, Application Instructions (2012).

**Request for Variance: Roles in the Offense and Biographical Mitigation**

1. **Mitigation in Facts of Offense**

Mr. McCarty accepts responsibility for the offense according to the facts in the factual basis of the plea. More importantly, early on, Mr. McCarty agreed to a Rule 20 transfer of his California Central District Court case transferred as 2:24-cr-00122-SPL to this Court. Supported

in paragraph 62 of the PSR, Defendant provided a statement wherein he admitted involvement in the offense and accepted responsibility. He indicated the factual basis of the plea agreement was accurate. Moreover, he understood that he has matured since his involvement in the offense and now understands the seriousness of his actions.

As stated above, Defendant's maturity and his aberrant upbringing played a mitigating role in his offense. Hence, The Court is asked to consider the policy statement in the guidelines as a basis for variance rather than departure. Considering the totality of the facts in this case, a variance downward is proper here to accurately account for the limited responsibility and culpability accrued against this defendant.

Dr. Baker elucidates the scientifically backed correlation between Adverse Childhood Events (ACES) and future substance abuse, maladaptive social behavior, and crime. Moreover, the combination of unresolved trauma and substance abuse create a complex set of circumstances that must be addressed; conditions related to trauma are often undiagnosed or misdiagnosed and therefore remain untreated for years.

The ACES include:

1. Emotional/verbal abuse
2. Physical abuse
3. Sexual abuse
4. **Emotional neglect**
5. **Physical neglect**
6. Family violence (domestic violence in the home)
7. **Household substance use**
8. **Household mental illness**
9. **Parental separation, death, abandonment, divorce**
10. Incarceration of household member

The Philadelphia ACE's, added to the diagnostic literature, which may be more applicable to minor individuals include:

1. **Peer or classmate bullying**

8

2. Witnessing violence outside the home
**3. Racial discrimination**
**4. Foster care (or out-of-home) placement**
5. Neighborhood safety and trust

The bolded items are those Dr. Baker identified as applying specifically to Defendant. Current science has established "an undeniable link between exposure to stress, trauma and adversity in childhood and adolescence, with later development of psychiatric disorders."

Defendant accepts responsibility for his decisions and his conduct; nevertheless, Defendant has been unable to separate himself from the harm caused by abuse. From a very young age, Defendant was a victim of parental substance abuse, physical abuse, medical misdiagnoses, bulling, speech impediment, mood swings, ADHD, and isolation.

**SENTENCING RECOMMENDATION**

The plea agreement contains a stipulation the range of 4 to 7 years of imprisonment. Given all the characteristics of this defendant, the Court is asked to consider a variance and sentence the defendant to the middle of this range. In conversation with Counsel, Dr. Baker remarked that for victims of severe trauma, time in custody re-traumatizes the person and makes future treatment more difficult. By this reason, Defendant requests that he Court consider a significant variance for Mr. McCarty. (See U.S.S.G. §5K2.13)

**OBJECTION TO SPECIAL CONDITION NUMBER 9**

Special condition No. 9 requires that defendant sex offender treatment. While there is an allegation that Defendant possessed pornography which allegedly containing prepubescent individuals, Defendant was not charged with any crime relating to child pornography. Moreover, investigation never identified participants in the pornography as children, only that the "videos appeared to be between the ages of 8 and 12 years old." (See paragraph 23 of the PSR.)

## CONCLUSION

For all the foregoing reasons, Defendant respectfully requests that the Court sentence Defendant to middle of the stipulated range of 4 to 7 years in prison followed by 36 months of Supervised Release. This sentence is "sufficient, but not greater than necessary" to comply with the purpose of 18 U.S.C. § 3553(a)(2). Defendant also requests that the Court not consider Supervised Release Special Condition No. 9.

RESPECTFULLY SUBMITTED this 10th day of June, 2024.

MYLES A. SCHNEIDER & ASSOC., LTD.

/s/Myles A. Schneider
MYLES A. SCHNEIDER (AZ Bar No.:028436)
14001 N. 7th Street
Suite B104
Phoenix, AZ 85022
myles@maschneider.com
Telephone: 602-926-7373
Facsimile: 877/294-4254
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 10th, 2024, I electronically transmitted the attached document to the Clerk's Office and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant: Myles Schneider

/s/ Myles A. Schneider